Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





TEXAS TECH UNIVERSITY HEALTH
SCIENCES CENTER,


 Appellant,


v.


RICKEY LUCERO and

LARRY LUCERO, SURVIVORS AND
HEIRS AT LAW OF PATRICIA
LUCERO, DECEDENT, AND THE
ESTATE OF PATRICIA LUCERO,


 Appellees.
§


 


§


 


§


 


§


 


§



§


 §


 §

No. 08-05-00297-CV



Appeal from


 County Court at Law No. 7


of El Paso County, Texas


(TC # 2003-3753)




O P I N I O N



 This is a medical malpractice case filed against a governmental entity pursuant to the Texas
Tort Claims Act (the Act). Texas Tech University Health Sciences Center (Tech) appeals from a
judgment rendered in favor of Rickey Lucero and Larry Lucero, Survivors and Heirs at Law of
Patricia Lucero, Decedent, and the Estate of Patricia Lucero (Lucero). We affirm.

FACTUAL SUMMARY


 On January 22, 2001, seventy-eight-year-old Patricia Lucero underwent laproscopic removal
of her gallbladder. A Tech physician, Dr. Emmett McGuire, performed the surgery. The procedure
was successful and Lucero was discharged from the hospital the following day. She had follow-up
visits at Tech in February and March. At the March visit, she complained of abdominal pain. A
liver function test showed an elevated level of alkaline phosphatase which can indicate inflammation
in the bile duct. On May 11, Lucero telephoned Tech and complained of intermittent pain radiating
from the epigastric area to the left side of the chest. A resident physician, Dr. Hyo-Rang Lee, wrote
on the chart that a chest x-ray, EKG, and a basic metabolic panel with CBC should be performed,
with Lucero receiving the next available appointment thereafter. Dr. Lee did not order the tests and
there is no indication that the nursing staff contacted Lucero. Lucero saw Dr. McGuire on May 16
and he noted her complaint about pain on the left side. According to Dr. McGuire, her complaints
were not consistent with a bile leak or stricture.

 Lucero returned to Tech on June 5 for another follow-up visit. She saw Dr. Lee and
described pain in the upper left quadrant of her abdomen, as well as back pain and tingling in her left
hand. Dr. Lee ordered a CT scan and liver function lab work, but these tests were not performed
until August 16.

 Meanwhile, Lucero went to the La Fe Clinic on July 12 and the staff sent her to
R.E. Thomason Hospital's emergency room because she was jaundiced. Lucero was admitted and
a consult was obtained from Dr. Saket Prasad, a Tech gastroenterologist. Lucero's liver function
tests were markedly abnormal with elevated levels of bilirubin, alkaline phosphatase, AST and ALT,
indicating an obstruction in the bile duct. On July 13, Dr. Prasad performed an endoscopic
retrograde cholangiopancreatography (ERCP), which is a procedure to visualize the bile duct. Dr.
Prasad diagnosed a common hepatic duct stricture or narrowing of the bile duct. (1) He placed a stent
in the bile duct to open the stricture and allow bile to drain past the stricture. Lucero was discharged
from Thomason on July 14.

 During a telephone call to Dr. Prasad on July 30, Lucero complained of back pain. 
Dr. Prasad did not believe the pain was related to the ERCP procedure. On August 9, Lucero
returned to Tech, but she did not see Dr. Prasad. The notes from that visit reflect that Lucero was
continuing to experience pain. Lucero saw Dr. Lee again in August. Following the visit, Lucero
wrote a letter complaining of Dr. Lee's comments:

 To Whom it May Concern: I would like to request that a new doctor be assigned to
me, because Dr. Lee (female) failed to understand the medical complaints I went to
see her for and did not address them as valid. She began asking myself and my
daughter (who always accompanies me at my clinic visits) if we had boyfriends, and
further stating that we needed to spend time apart from each other and that we should
see other people, which was most inappropriate. Insinuating that because my
daughter inquires how I'm feeling that it was somehow causing me to have
psychosomatic symtoms [sic] of a hypochondriac. On July 12, 2001 I went to La Fe
clinic because (I was not getting the attention I was seeking from Dr. McGuire or
Dr. Lee at Texas Tech) I was seriously jaundiced and was sent back to Thomason
emergency by the doctor at La Fe Clinic, later that evening I was hospitalized after
which I underwent an endoscopy procedure to insert a stent because I was found to
have a stricture of my bile duct.


 A CT scan was performed on August 16 and the radiologist concluded there was decreased
attenuation around the porta hepatis, suggesting a tumor. Dr. Prasad reviewed the film with the
radiologist and disagreed with that finding. He believed that the irregular attenuation was unrelated
to the bile duct stricture. Lab tests revealed that Lucero's liver function tests had almost completely
normalized. Dr. Prasad did not see Lucero again until September 4. His notes reflect that Lucero
complained of diffuse body ache and mild abdominal pain, and her alkaline phosphatase reading was
markedly high. His impression was that there was a biliary stricture in the common bile duct. He
planned to perform another ERCP on October 11. However, Lucero's daughter, Kathy, called on
September 11 and asked whether the ERCP could be moved to an earlier date because her mother
was experiencing abdominal cramps and back pain. Dr. Prasad did not reschedule because he
believed that Lucero's pain was possibly related to osteoporosis. When Kathy called him again and
asked whether he minded if Lucero saw another doctor, he did not object.

 Dr. Jesus Hernandez, a gastroenterolgist, first examined Lucero on September 20. He
initially concluded that there was a bile duct stricture but he believed she was stable. However, he
admitted her to Providence Hospital that evening after she called to report fever and chills. Because
she had a stent in the bile duct, he thought it possible that the stent was clogged and she might have
an infection. When he performed an ERCP, he discovered that the stent was occluded and had
migrated from where it had been placed by Dr. Prasad. Although stents commonly migrate, this case
was unusual because the stent had migrated through the wall of the bile duct, causing a tear in the
bile duct and a bile leak. He removed the existing stent and placed one in the right side of the bile
duct. He was unable to place a stent in the left side due to the tear. 

 Following the ERCP, Dr. Hernandez went to Thomason Hospital to review the films. He
concluded from the August 16 CT scan that the stent was not in the intrahepatic biliary system. He
talked to Dr. Prasad, advising him of the ERCP results and his review of the August 16 CT scan. 
He told Dr. Prasad that the stent had migrated, that it was poking through the bile duct wall, and that
there was a bile leak. Dr. Prasad responded, "Well, that's that." Lucero's condition continued to
deteriorate and on September 25, Dr. Hernandez again tried, albeit unsuccessfully, to place a stent
on the left side. He concluded that Lucero required a major biliary reconstruction procedure and 
referred her to Baylor Medical Center. Lucero was transferred to Baylor but the doctors were unable
to repair her bile duct. She was returned to El Paso, developed sepsis, and died on December 20. 
 Dr. Hernandez testified that the bile duct stricture and bile leak led to a bacterial infection
in the biliary system which spread into the liver. Because the infection could not be cleared, Lucero
developed sepsis and died as a result. Dr. Hernandez believed that Dr. Prasad had correctly placed
the stent. But since the August 16 CT scan revealed that the stent had migrated, it should have been
removed and the nature of the problem investigated further. According to Dr. Hernandez,
Dr. Prasad breached the standard of care by failing to take these actions.

 Another expert witness, Dr. Mazen Jamal, testified that Dr. Prasad should have diagnosed
the bile leak on August 16. In his opinion, Lucero probably had an infection at that time. If
Dr. Prasad had treated it properly in August and September, Lucero would not have developed the
liver abscesses and liver failure which led to her death.

 On May 14, 2002, Tech received a letter from an attorney representing the Lucero
plaintiffs alleging "negligent performance of gallbladder surgery on January 22, 2001 and negligent
post-operative care that was the proximate cause of Mrs. Lucero's death on December 20, 2001." 
The plaintiffs filed suit on August 29, 2003, alleging medical malpractice and misuse of property
under the Texas Tort Claims Act. A jury found that Tech's negligence proximately caused Lucero's
death and awarded damages to Lucero's estate for her pain, mental anguish, and medical expenses. 
No damages were awarded to Larry and Rickey Lucero. The jury further found that Tech had notice
of the claim not later than six months after the occurrence of the incident giving rise to the claim. 
The trial court denied Tech's motion for judgment non obstante veredicto, and entered judgment for
the estate in the amount of $250,000. This appeal follows.

NOTICE


 In Issue One, Tech complains that Lucero failed to provide the notice required by
Section 101.101 of the Act. It contends that notice is jurisdictional and must be reviewed de novo. (2)
Lucero responds that notice is not jurisdictional and that the jury's finding must be reviewed under
the traditional legal sufficiency standard. (3) We agree with Lucero.

The Statutes and The Amendment


 Section 101.101provides that:

 (a) A governmental unit is entitled to receive notice of a claim against it under this
chapter not later than six months after the day that the incident giving rise to the
claim occurred. The notice must reasonably describe:


 (1) the damage or injury claimed;


 (2) the time and place of the incident; and


 (3) the incident.

Tex.Civ.Prac.&Rem.Code Ann. § 101.101 (a)(Vernon 2005). Proper notice ensures prompt
reporting of claims to enable governmental units to gather information necessary to guard against
unfounded claims, to settle claims, and to prepare for trial. City of Houston v. Torres, 621 S.W.2d
588, 591 (Tex. 1981).

 The notice requirements do not apply if the governmental unit has actual notice. 
Tex.Civ.Prac.&Rem.Code Ann. § 101.101 (c). Actual notice requires knowledge of (1) death,
injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to
the death, injury, or property damage; and (3) the identity of the parties involved. Cathey v. Booth,
900 S.W.2d 339, 340 (Tex. 1995). The governmental unit must have subjective awareness that its
purported fault could have produced or contributed to the death, injury, or property damage, but it
is not required to know that the claimant has actually alleged fault. Texas Department of Criminal
Justice v. Simons, 140 S.W.3d 338, 347-48 (Tex. 2004).

 In Simons, the Supreme Court held that although the notice requirement is mandatory, it is
not jurisdictional. Id. at 348-49. In an opinion issued the same date, the court held that notice is not
a condition of the Act's waiver of immunity. University of Texas Southwestern Medical Center at
Dallas v. Loutzenhiser, 140 S.W.3d 351, 364 (Tex. 2004). Because notice is not jurisdictional, a
governmental unit cannot raise it in a plea to the jurisdiction nor can it obtain interlocutory appellate
review if the trial court refuses to dismiss the suit. Simons, 140 S.W.3d at 349.

 The Legislature has since amended Section 311.034 of the Government Code to provide that:

 Statutory prerequisites to a suit, including the provision of notice, are jurisdictional
requirements in all suits against a governmental entity.


Tex.Gov't Code Ann. § 311.034 (Vernon Supp. 2006). The statute's effective date was
September 1, 2005 and the Legislature did not provide for retroactive application. This case was
tried and judgment entered prior to September 1, 2005.

 We generally presume that the Legislature intends an amendment to operate prospectively
and not retroactively. Subaru of America, Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 219
(Tex. 2002); Tex.Gov't Code Ann. § 311.022 (Vernon 2005)(a statute is presumed to be
prospective in its operation unless expressly made retrospective). This presumption does not apply
when the amendment is procedural or remedial because procedural and remedial statutes typically
do not affect a vested right. Subaru, 84 S.W.3d at 219. A statute conferring or ousting jurisdiction
applies to existing suits because such laws generally do not affect substantive rights. Id., citing
Landgraf v. USI Film Prods., 511 U.S. 244, 274, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Instead,
jurisdictional statutes speak to the court's power rather than to the parties' rights or obligations. Id. 
And a jurisdictional statute usually does not take away substantive rights but simply changes the
tribunal that is to hear the case. Id.

 The Beaumont Court of Appeals has determined that the 2005 amendment applies
retroactively because it is a jurisdictional statute and does not affect substantive rights. Texas
Department of Criminal Justice v. Simons, 197 S.W.3d 904, 907 (Tex.App.--Beaumont 2006, no
pet.), citing Subaru of America, 84 S.W.3d at 220. Instead, it merely changes the point at which a
governmental entity may appeal. 197 S.W.3d at 907. We disagree because we do not view the
amendment as merely impacting when a governmental entity may appeal. Pursuant to the
amendment, a plaintiff's suit is barred by sovereign immunity unless the plaintiff pleads and proves
notice. A governmental unit now has an unwaivable right to notice and can raise this jurisdictional
defect for the first time on appeal. This is a significant alteration of the Simons and Loutzenhiser rule
that notice is subject to waiver. We will presume that the Legislature did not intend for the
amendment to apply retroactively. Pursuant to the Supreme Court's decisions in Simons and
Loutzenhiser, we reject Tech's argument that it retained sovereign immunity if the Lucero plaintiffs
failed to comply with Section 101.101.

Standard of Review


 The jury's finding on the notice issue is subject to legal sufficiency review. There are two
separate legal insufficiency claims. When the party without the burden of proof suffers an
unfavorable finding, the challenge is one of "no evidence to support the finding." See Creative
Manufacturing, Inc. v. Unik, 726 S.W.2d 207, 210 (Tex.App.--Fort Worth 1987, writ ref'd n.r.e.). 
Where the party having the burden of proof suffers an unfavorable finding (failure to find), the
proper complaint is that the fact was established as "a matter of law." See Sterner v. Marathon Oil
Company, 767 S.W.2d 686, 690 (Tex. 1989). Here, Tech filed a verified special denial that it
received timely notice. Consequently, Lucero had the burden to plead and secure a finding on notice.
See Texas Tech University Health Sciences Center v. Apodaca, 876 S.W.2d 402, 410-11 (Tex.App.--El Paso 1994, writ denied)(holding that where the governmental unit filed a verified special denial
that it received timely actual notice, the plaintiff had the burden to prove and secure a finding on
actual notice at trial); see also Harrison v. Texas Department of Criminal Justice-Institutional
Division, 915 S.W.2d 882, 890 (Tex.App.--Houston [1st Dist.] 1995, no writ)(plaintiff alleged notice
and defendant failed to deny it; consequently, lack of notice was not a ground for recovery);
Huckabay v. Irving Hospital Foundation, 802 S.W.2d 758, 761 (Tex.App.--Dallas 1990, writ
denied)(notice is an indispensable element of the plaintiff's cause of action). Accordingly, we will
apply the "no evidence" standard.

 An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record
shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence
from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite
of the vital fact. City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). We construe Tech's
argument as falling within the first circumstance which necessarily precludes us from automatically
disregarding contrary evidence in a legal sufficiency review. Id. at 810-11 (stating that contrary
evidence may not be disregarded in sufficiency reviews under the first, second, and fourth
circumstances).

 In conducting our review, we consider the evidence in the light most favorable to the verdict
and indulge every reasonable inference that would support it. Id. at 822. Even if evidence is
undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long
as more than one inference is possible. Id. at 821. But if the evidence allows only one inference,
neither the trier of fact nor the reviewing court may disregard it. Id. We are also mindful that the
trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony.
Id. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such
conflicts. Id. at 820. In every circumstance in which a reasonable trier of fact could resolve
conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing
party, and disregard the conflicting evidence in its sufficiency review. Id. at 821. If the evidence
at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier
of fact must be allowed to do so. Id. at 822. So long as the evidence falls within this zone of
reasonable disagreement, we may not substitute our judgment for that of the trier of fact. Id. The
ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and
fair-minded people to reach the verdict under review. Id. at 827.

Written Notice


 Section 101.101 requires that the plaintiff provide written notice of the claim not later than
six months after the day that the incident giving rise to the claim occurred. Lucero's petition
identified two incidents: the ERCP performed on July 13, 2001, and the abdominal CT scan
performed on August 16, 2001. Because Lucero did not provide written notice of the claim arising
from these incidents until May 13, 2002, notice was untimely.


Actual Notice


 One of the plaintiffs' primary theories of recovery is that Tech misinterpreted the CT scan
performed on August 16, 2001. As a result, it failed to remove the stent in a timely manner and
Lucero developed an abscess in the liver. For the plaintiffs to prevail, the evidence must show that
Tech had knowledge of the injury, its alleged fault producing or contributing to the injury, and the
identity of the parties involved. See Cathey, 900 S.W.2d at 340. Actual notice also requires a
showing that Tech had a subjective awareness that its purported fault could have produced or
contributed to the death, injury, or property damage. Simons, 140 S.W.3d at 348.

 Shortly after he performed the September 21 ERCP, Dr. Hernandez viewed the films of the
August 16 CT scan and determined that the radiologist had misread them. In his opinion, the CT
scan showed that the stent was going out of the biliary system into the subhepatic fossa. He called
Dr. Prasad and informed him of "[e]xactly what [he] found." Dr. Prasad recalled that they viewed
the films together. Dr. Hernandez told Dr. Prasad that Lucero had been admitted under his care, that
he had performed an ERCP, that the stent had migrated and was protruding through the bile duct,
and that there was a bile leak. While Dr. Hernandez did not specifically say that he informed Dr.
Prasad of his interpretation of the CT scan, a reasonable jury could infer that he did so since the two
doctors reviewed the films together and Dr. Hernandez told him "[e]xactly what [he] found." From
this conversation, Dr. Prasad had knowledge of the bile leak, knowledge of the patient's identity, and
knowledge that he had misread the August 16 CT scan. A jury could reasonably infer that Dr. Prasad
knew after speaking with Dr. Hernandez that his misinterpretation of the CT scan led to the bile leak
being undiagnosed for more than a month. This constitutes subjective awareness that his alleged
fault could have produced or contributed to Lucero's injury. We conclude the evidence is legally
sufficient to establish that Tech had actual notice of Lucero's injuries caused by the misinterpretation
of the August 16 CT scan. Issue One is overruled.

SOVEREIGN IMMUNITY


 In Issue Two, Tech contends that there was no waiver of sovereign immunity because
Lucero's claims are based on the non-use of personal property. When a lawsuit is barred by
sovereign immunity, the trial court lacks subject matter jurisdiction and dismissal with prejudice is
proper. Sepulveda v. County of El Paso, 170 S.W.3d 605, 610 (Tex.App.--El Paso 2005, pet.
denied); City of Austin v. L.S. Ranch, Ltd., 970 S.W.2d 750, 752 (Tex.App.--Austin 1998, no pet.). 
Subject matter jurisdiction is a legal question which we review de novo. Sepulveda, 170 S.W.3d at
610; City of Saginaw v. Carter, 996 S.W.2d 1, 2 (Tex.App.--Fort Worth 1999, pet.dism'd w.o.j.).

The Statute


 As a state agency, Tech is immune from suit unless that immunity is waived. The Tort
Claims Act does not waive sovereign immunity for all negligence claims against governmental units. 
Texas Department of Criminal Justice v. Miller, 51 S.W.3d 583, 588 (Tex. 2001). Relevant to this
case, the Act provides that a governmental unit in the state is liable for:

 [P]ersonal injury and death so caused by a condition or use of tangible personal or
real property if the governmental unit would, were it a private person, be liable to the
claimant according to Texas law.


Tex.Civ.Prac.&Rem.Code Ann. § 101.021(2) (Vernon 2005).

 To state a claim under the Act based upon the use or misuse of non-defective tangible
personal property, a plaintiff must allege that the property was used or misused by a governmental
employee acting within the scope of his or her employment. Salcedo v. El Paso Hosp. Dist., 659
S.W.2d 30, 32 (Tex. 1983); Sepulveda, 170 S.W.3d at 614-15. The negligence of the governmental
employee must be the proximate cause of the injury and must involve a use or misuse of tangible
personal property under circumstances where there would be private liability. Salcedo, 659 S.W.2d
at 32; Sepulveda, 170 S.W.3d at 615. "Use" means "to put or bring into action or service; to employ
for or apply to a given purpose." Miller, 51 S.W.3d at 588, quoting Texas Natural Resource 
Conservation Commission v. White, 46 S.W.3d. 864, 869 (Tex. 2001). The usage of the property
must have actually caused the injury. Miller, 51 S.W.3d at 588; see San Antonio State Hospital v.
Koehler, 981 S.W.2d 32, 35 (Tex.App.--San Antonio 1998, pet. denied)(use of the property must be
a substantial factor in bringing about the injury). Incidental involvement of the property is
insufficient. Dallas County Mental Health and Mental Retardation v. Bossley, 968 S.W.2d 339, 343
(Tex. 1998). Property does not cause injury if it does no more than furnish the condition that makes
injury possible. Bossley, 968 S.W.2d at 343. The Act does not provide for liability based upon a
non-use of property. Kassen v. Hatley, 887 S.W.2d 4, 14 (Tex. 1994); Sepulveda, 170 S.W.3d at
615.

The Pleadings


 The amended petition alleged that Lucero's death was proximately caused by:

  the negligent misuse of equipment in the performance of the July 2001 ERCP;


  the failure to perform an ERCP in August, September, or October 2001 to diagnose the
cause of her increased abdominal pain in August 2001;


  the negligent misuse of equipment in August 2001, specifically an abdominal CT scan that
indicated liver abscess; and

  the failure to properly and timely diagnose and treat Lucero's bile leak, liver bilomas, and
abcess. 

The first allegation addresses the misuse of equipment in the July 2001 ERCP performed by
Dr. Prasad. Thus, it ostensibly states a claim which falls within the Act's waiver of immunity. But
there is no evidence that Dr. Prasad misused the stent or any other equipment during the ERCP
procedure. To the contrary, there is evidence that Dr. Prasad correctly placed the stent. 
Consequently, there is no waiver of sovereign immunity based on the first allegation. The second
allegation merely alleges a failure to perform a procedure and does not allege the use or misuse of
tangible personal property. Therefore, it does not fall within Section 101.021(2)'s waiver of
sovereign immunity either.

 With regard to the third and fourth allegations, the Lucero plaintiffs attempt to bring their
claims within the Act by alleging the misuse of the abdominal CT scan and the related failure to
diagnose the bile leak. Tech counters that these allegations are based on the non-use of medical
information, a claim for which sovereign immunity is not waived. Our analysis requires a discussion
of four relevant Supreme Court cases.

The Supreme Court Speaks. . .


 In Salcedo v. El Paso Hosp. Dist., 659 S.W.2d 30 (Tex. 1983), a patient's electrocardiogram
readings showed a classic heart attack pattern but an emergency room physician released him. Id.
at 31. The patient collapsed shortly after returning home and died as the result of myocardial
infarction. Id. His widow filed suit and pled that employees or agents of the hospital district
misused the electrocardiographic equipment by improperly reading and interpreting the graphs and
charts produced by the equipment. Id. Noting that reading and interpreting are purposes for which
an electrocardiogram graph is used in diagnosing myocardial infarction, the Supreme Court held that
the allegations stated a cause of action under the Tort Claims Act because it alleged a misuse of
tangible personal property. Id. at 33.

 In University of Texas Medical Branch at Galveston v. York, the plaintiffs brought suit
against UTMB for negligence in failing to diagnose a broken hip. University of Texas Medical
Branch at Galveston v. York, 871 S.W.2d 175 (Tex. 1994). They alleged that the failure to record
medical information in the patient's chart and to follow a recommendation in the medical records
for an x-ray of the patient's hip was a misuse of tangible personal property which waived immunity. 
Id. The Supreme Court decided Salcedo was not factually analogous because the plaintiffs had not
alleged misuse of any hospital device or equipment. Id. at 178. While the paper on which doctors
and nurses record information about a patient's condition is tangible, information is intangible. The
fact that "information" is recorded in writing does not render it tangible property within the meaning
of the Act. Id. at 178-79.

 The Supreme Court reached the same conclusion in Kassen v. Hatley, 887 S.W.2d 4 (Tex.
1994). There, a psychiatric patient who was threatening to harm herself was taken by a police officer
to a psychiatric emergency room. The facility had a "difficult patient file" on her, which
recommended that she be referred to Dallas County MHMR unless she presented with different
symptoms than in the past. When a doctor decided to release her, she became angry and threatened
to kill herself by walking into traffic. The doctor and the charge nurse did not return her medication
because she admitted exceeding her dosage. A security officer escorted her from the hospital. The
patient committed suicide shortly after leaving Parkland Hospital by stepping into freeway traffic. 
Her parents filed a wrongful death action against the doctor, the charge nurse, and Parkland. The
court held that a psychiatric patient's medical records, her "difficult patient file," and the state
hospital's emergency room procedural manual are not tangible personal property such that the use,
misuse, or non-use of these items did not support a claim under the Act. Kassen, 887 S.W.2d at 14.

 The Supreme Court subsequently limited Salcedo to its facts in Dallas County MHMR v.
Bossley, 968 S.W.2d 339, 342 (Tex. 1998). There, a patient escaped from a mental health facility
through an unlocked door and died when he threw himself in front of a moving vehicle. The
plaintiffs attempted to bring the case within the Tort Claims Act by alleging that the patient's death
was caused by a member of the facility leaving a door unlocked. The trial court granted the
defendant's motion for summary judgment based on sovereign immunity. The Dallas Court of
Appeals reversed, relying upon the statement in Salcedo that negligent conduct for which immunity
is waived must involve some condition or some use of tangible property. The court construed this
statement to mean that for immunity to be waived, the property does not have to be the
instrumentality of harm--it need only be involved. Bossley, 968 S.W.2d at 342. In reversing, the
Supreme Court focused on this misinterpretation of Salcedo, concluding that the unlocked doors
permitted the patient to escape, but did not cause his death. Id. at 343. The use and condition of the
doors were too attenuated from the patient's death to have caused it. Id.

. . . And The Intermediate Courts Interpret


 Although Tech contends that Salcedo is not viable authority, the Supreme Court has not
overruled it. Intermediate appellate courts have continued to apply Salcedo where the plaintiff has
alleged a misuse of diagnostic medical equipment. See University of Texas Medical Branch at
Galveston v. Estate of Blackmon, 169 S.W.3d 712, 721-22 (Tex.App.--Waco 2005)(nurse's use or
misuse of stethoscope and pulse oxymeter was proximate cause of inmate's death from severe
pneumonia for purposes of establishing waiver of sovereign immunity on grounds of use of tangible
personal property), vacated and appeal dismissed for want of jurisdiction, 195 S.W.3d 98 (Tex.
2006)(while UTMB's interlocutory appeal from the denial of its plea to the jurisdiction was pending
in the court of appeals, the plaintiff filed a nonsuit which deprived the court of appeals of
jurisdiction); Baston v. City of Port Isabel, 49 S.W.3d 425, 428-29 (Tex.App.--Corpus Christi 2001,
pet. denied)(relying on Salcedo, court held that the plaintiff's allegation of negligence in failing to
properly monitor a cardiac monitor was a use of tangible personal property); University of Texas
Medical Branch Hospital at Galveston v. Hardy, 2 S.W.3d 607, 609-10 (Tex.App.--Houston [14th
Dist.] 1999, pet. denied)(plaintiffs' allegations of negligent use or misuse of an EKG stated a claim
under the Act; court rejected defendant's argument that Salcedo was no longer viable). 

 Only the San Antonio Court of Appeals has refused to apply Salcedo, finding that it was no
longer viable in the wake of Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540 (Tex. 2003). 
See Anderson v. City of San Antonio, 120 S.W.3d 5, 8 (Tex.App.--San Antonio 2003, pet. denied). 
But Whitley did not involve an allegation of misuse of diagnostic medical equipment. The plaintiff
was riding on a bus when he was harassed and threatened by a female passenger named Burkley.
Whitley, 104 S.W.3d at 541-42. The bus driver asked Whitley to exit the bus and told him he would
pick him up in a few minutes. Id. at 542. Burkley threatened to kill the plaintiff as he exited. Id. 
The bus traveled two blocks and Burkley exited. Id. She recruited family members to assault the
plaintiff. Id. Finding the plaintiff where the bus driver had left him, they severely beat him. Id. The
plaintiff alleged in his suit against DART that a city bus driver wrongfully ejected him in a remote
and dangerous area of Dallas, allowed another passenger to exit the bus after she had assaulted and
threatened the plaintiff in the driver's presence, and then failed to pick him up as promised. Id. The
Supreme Court found that the plaintiff's injuries did not arise from the use of the bus, but rather from
the assailants' actions and the driver's failure to supervise the public. Id. at 542-43. Thus, there was
no nexus between the operation or use of the motor vehicle and the plaintiff's injuries. Id. at 543.

 Anderson involved the purported use or misuse of electrocardiograms (EKGs). Emergency
medical technicians (EMTs) were dispatched to the residence of the decedent who was experiencing
severe chest pain and left arm numbness. Anderson, 120 S.W.3d at 6. The EMTs performed two
EKGs and decided that Anderson didn't need to be taken to the hospital. Id. Later the same day,
Anderson experienced more chest pain. This time, he was taken to the hospital but he died that
evening. Id. The plaintiffs alleged that the EMTs negligently used the EKG. Id. But the court held
that the decedent's death was caused by his cardiac condition and the EMTs' alleged negligence, not
by the use of the EKG machine itself. Id. at 9. 

 Because we disagree with the San Antonio court's interpretation of Whitley, we will apply
Salcedo. Like the electrocardiogram graph in Salcedo, an abdominal CT scan and its films are used
in diagnosing various conditions of the abdomen. The Lucero plaintiffs alleged and offered evidence
to prove that there was a misuse of the abdominal CT scan performed on August 16, 2001. Finding 
a waiver of sovereign immunity, we overrule Issue Two. See Salcedo, 659 S.W.2d at 33. Having
overruled both issues for review, we affirm the judgment of the trial court.


August 2, 2007 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.

1. Dr. McGuire testified that this stricture could have resulted from the January gallbladder surgery. 
2. Tech sets forth the legal sufficiency standard established in City of Keller v. Wilson, 168 S.W.3d 802 (Tex.
2005) but argues throughout its brief that notice is jurisdictional.
3. Because Tech did not raise factual sufficiency in a motion for new trial, the issue is waived. See Tex.R.Civ.P.
324(b)(2), (3).